**TRANSAMERICA CORPORATION, Plaintiff,**

v.

**TRANS AMERICA ABSTRACT SERVICE, INC. and Barrett Samuels, Defendants.**

**No. 86 CV 1856.**

United States District Court, E.D. New York.

Nov. 1, 1988.

Siegrun D. Kane and Barbara A. Larsen, Kane Dalsimer, Kane, Sullivan & Kurucz, New York City, for plaintiff.

Baila H. Celedonia and Katharine S. Dodge, Cowan, Liebowitz & Latman, P.C., New York City, for defendants.

McLAUGHLIN, District Judge.

Plaintiff moves for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons discussed below, the motion is denied.

## FACTS

Plaintiff, a Delaware corporation having its principal place of business in San Francisco, California, offers life, health, property and casualty, and title insurance through a number of its wholly-owned subsidiaries identified by the name "Transamerica". Defendant Trans America Abstract Service, Inc., is a New York corporation located in Williston Park, Long Island, which renders title abstracting, searching and examining services under its own name and issues title insurance as an independent agent of the title insurance companies it represents. Defendant Samuels is its founder and president. As the caption suggests, this is an action for trademark infringement under the Lanham Act, 15 U.S. C. §§ 1114, 1125(a), unfair competition, and dilution under N.Y.Gen.Bus.L. § 368–d. Plaintiff seeks to enjoin defendants' use of the name Trans America for title insurance issuing and title searching services. Many of the facts are in dispute. Thus, to the

extent support is found in the competent evidence submitted by defendants in opposition to this motion, all factual ambiguities will be resolved in their favor. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir.1988); *Pappas v. Air France*, 652 F.Supp. 198, 201 (E.D.N.Y.1986).

Plaintiff is the owner of the registration for the TRANSAMERICA mark. The mark was registered by plaintiff in July 1967 for use in its underwriting insurance services, including title insurance. The registration of the mark has become incontestable. 15 U.S.C. § 1065. Although plaintiff has offered insurance services and has advertised these services under the TRANSAMERICA mark for over 50 years, its title insurance subsidiary, Transamerica Title Insurance Co. ("Transamerica Title" or "plaintiff's title insurance subsidiary"), has only recently begun offering services in the eastern United States.[1] Plaintiff has spent in excess of $55 million since 1970 advertising its insurance services nationally in magazines and newspapers such as Time, Forbes, The Wall Street Journal, The New York Times, Newsweek and Business Week. Plaintiff was also one of the sponsors of the 1984 Olympics. Most of the advertisements, however, do not make mention of plaintiff's title insurance services, *see* Exhibits to Declaration of William H. McClave, Jr., and plaintiff's title insurance subsidiary has not done any advertising in New York. Indeed, plaintiff's title insurance subsidiary has an advertising and promotion budget of less than $100,000.

From 1975 to March 31, 1987, plaintiff's title insurance subsidiary grossed over $1 billion in premiums. However, since it did not begin to receive premiums on title insurance policies sold in New York until 1987, only $152,342 of the gross premiums are attributable to New York accounts.

In the eastern United States, Transamerica Title issues title insurance only through independent agents, who are not permitted to use the TRANSAMERICA mark in their corporate names. In Florida and in the western United States, Transamerica Title also uses direct company operations to solicit customers. These direct company operations generate about 50% of Transamerica Title's gross premiums. Title searching services are provided in these states by Transamerica Title directly and through its independent agents. In the East, however, plaintiff has no intention of issuing title insurance directly or conducting abstracting services in its own name. It is plaintiff's present strategy to pursue this business only through agents. Plaintiff's customer advertising is designed primarily to reach real estate professionals, particularly lawyers.

Defendants adopted the name Trans America Abstract Service, Inc. for its title insurance services in 1975. Although defendant Samuels instructed his lawyer to conduct a corporate name search in New York before adopting this name, no trademark or tradename search was conducted. Defendants have no present intention of expanding their operations outside New York State. From 1975 to the present, defendants' customer list has grown from 50 to over 300, of whom 95% are lawyers, 5% are real estate developers, mortgage lenders and brokers. Defendants provide services for both residential and commercial closings, the majority of which occur on Long Island. Except for a listing in the telephone book, defendant does no advertising—new clients are obtained through personal recommendations. Defendants use the full corporate name, "Trans America Abstract Service, Inc.," at all times, except in answering the telephone, when the abbreviated phrase "Trans America" is used.

1. Transamerica Title Insurance Company's activities were concentrated in the western part of the United States. By 1985, Transamerica Title was licensed to do business in 30 states. Only seven of those states, however, were east of the Mississippi River. In 1986, Transamerica Title added seven more states including New York, North Carolina, Florida, Connecticut, Wyoming and Arkansas. Transamerica Title Insurance Company of New York, a wholly owned subsidiary of Transamerica Title was incorporated in 1984, and began issuing title insurance in November or December 1986. As of May 1987, there were approximately twelve Transamerica title insurance agents in New York.

In November 1984, defendants were served with a notice of infringement. Subsequent settlement negotiations were unfruitful and this action was commenced in June 1986. Discovery has been completed and plaintiff now moves for summary judgment enjoining defendants' use of the name Trans America for title insurance issuing and title searching services.

## DISCUSSION

### I. Summary Judgment Standard

A motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A fact is material or essential if it might affect the outcome of the suit under the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ Summary judgment is appropriate in a trademark action only if the material facts regarding likelihood of confusion are not in dispute. *Lois Sportswear U.S.A., Inc. v. Levi Stauss & Co.*, 799 F.2d 867, 876 (2d Cir.1986); *see American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 352 (2d Cir.1981).

### II. Classification of the Mark

■ The degree of protection accorded a trademark is to some extent guided by what type of trademark is allegedly being infringed.

Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). Neither party, however, has chosen to suggest which type of trademark plaintiff owns. The Court nevertheless concludes that plaintiff's mark is at least suggestive. Inasmuch as plaintiff's mark is registered, it could not be generic. *See McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). It is not descriptive, because the mark does not "identif[y] the characteristics and quality of the [service], such as its ... function[ ]" 3 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies, § 18.05 at 11 (L. Altmann ed. 1983). *See Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 212 (2d Cir.1985). Nor is it arbitrary or fanciful because it is not a common word applied in an uncommon manner or "a word invented solely for use as a trademark." *Pan American World Airways, Inc. v. Pan American School of Travel, Inc.*, 648 F.Supp. 1026, 1033 (S.D.N.Y.), *aff'd without opinion*, 810 F.2d 1160 (1986). As a suggestive mark, it is entitled to protection, regardless of proof of secondary meaning. *See McGregor–Doniger, supra*, 599 F.2d at 1132. Evidence of secondary meaning, however, can be examined to aid the fact finder in determining the strength of the mark. *See id.*

### III. Satisfaction of the *Polaroid* Factors

Twenty-seven years ago, Judge Friendly set forth what remains the controlling multifactor test for determining likelihood of confusion:

[T]he strength of [the owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert.*

*denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). "[E]ach factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Lois Sportswear, supra,* 799 F.2d at 872. "No single *Polariod* factor is determinative. Rather each must be considered in the context of all of the other factors...." *Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir.1983).

### A. Strength of Transamerica's Mark

■ The strength of a particular mark is " 'its tendency to identify the goods sold under the mark as emanating from a particular ... source [and] depends ultimately on its distinctiveness, or its "origin-indicating" quality, in the eyes of the purchasing public.' " *Banff, Ltd. v. Federated Department Stores, Inc.,* 841 F.2d 486, 491 (2d Cir.1988) (quoting *McGregor–Doniger, supra,* 599 F.2d at 1131). Plaintiff's mark, being registered and incontestable, is presumed distinctive and entitled to "significant protection." *Lois Sportswear, supra,* 799 F.2d at 871. Like the mark in *Pan American World Airways,* however, plaintiff's mark is "neither original nor unique." *Pan American World Airways, supra,* 648 F.Supp. at 1033. The mark derives solely from common words in the English vocabulary.

■ The strength of plaintiff's mark is also tested by existence or absence of third-party use. *See* 3A Callman, *supra,* § 20.44 at 358–59. There is no evidence that plaintiff's mark is used by any third party in the title insurance field.

■ Defendants argue, however, that the term Transamerica or Trans America is used by numerous third parties who engage in businesses outside the field of title insurance. In support of its argument, defendant submits a copy of a Manhattan telephone directory listing companies that employ the word Transamerica or Trans America as the first word in its name. The companies listed appear to be engaged in businesses ranging from fashion to couriers to metals.

That third parties may use the mark on products or services totally unrelated to the owner's use "is of little or no probative value." *American Scientific Chemical v. American Hospital Supply Corp.,* 690 F.2d 791, 794 (9th Cir.1982); *see W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir.1970); *Scarves By Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1173–74 (2d Cir.1976). In any event, there is no evidence suggesting that defendants actually contacted these companies. Thus, the telephone listing does no more than demonstrate that telephone numbers were subscribed to those names. *See Pan American World Airways, supra,* 648 F.Supp. at 1034. The inference that can be drawn from these listings, however, is that the word Transamerica is considered generally available. *See id.* (citing *Lever Brothers Co. v. American Bakeries, Co.,* 693 F.2d 251, 256–57 (2d Cir.1982)). *See also Transamerica Financial Corp. v. Trans–American Collections, Inc.,* 197 U.S.P.Q. 43 (T.T.A.B.1977).

Evidence of secondary meaning is also helpful, although not necessary, in determining whether a suggestive mark is strong.

■ "If a mark has secondary meaning, a purchaser will associate it with a certain producer, and will be likely to make that same association when an identical mark (or confusingly similar mark), is used on another purchaser's product." *Thompson Medical Co., supra,* 753 F.2d at 215–16. Certain factors may be calculated into the secondary meaning formula: advertising expenditures, consumer identification studies, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and the length and exclusivity of the mark's use. *Id.* at 217. The Second Circuit cautions, however, that "no 'single factor is determinative', ... and every element need not be proved." *Id.* (quoting *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir. 1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980)).

■ There is no dispute that plaintiff has spent millions of dollars in national

advertising. Nor is there any dispute that plaintiff has enjoyed considerable success in marketing title insurance. No doubt this type of evidence is probative of the strength of a mark, *see Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 949–50 (2d Cir.1981), but it is not conclusive. *See McGregor–Doniger, supra*, 599 F.2d at 1133 n. 4. In any event, the Court notes that considerably less has been spent advertising title insurance; and the premiums received on title insurance policies sold in New York account for a very small percentage of plaintiff's profits. These facts are at least circumstantial evidence that plaintiff's mark has not acquired secondary meaning with respect to title insurance.

Consumer studies may also form the basis of determining whether a mark has acquired secondary meaning. An advertising study was prepared on plaintiff's behalf in January 1987 and was submitted, *in camera*, by defendants in opposition to this motion. Again, however, the parties have left the Court in the dark. Neither party has attempted to guide this Court in determining how to decipher the study. Because studies such as this are easily subject to myriad manipulations, the Court is not inclined to guess at its interpretation or significance and accordingly, attaches no weight to it.

Finally, with regard to the length and exclusivity of the mark, the Court notes that plaintiff has used the mark, registered in 1967, since 1959. The only evidence submitted demonstrating the lack of exclusivity of plaintiff's use of the mark is the copy of the telephone directory discussed *supra*.

After careful examination of the relevant factors, the Court concludes that although plaintiff's mark is presumed strong, defendants have raised an issue of fact about their ability to overcome that presumption.

B. *The Degree of Similarity and The Proximity of the Products*

It is appropriate to consider the second and third *Polaroid* factors simultaneously. *See Hasbro, Inc. v. Lanard Toys,*

*Ltd.*, 858 F.2d 70, 77 (2d Cir.1988). With respect to the second factor, the ultimate question is whether the similarity of the marks is likely to cause confusion. The third *Polaroid* factor "addresses whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Id.*

To determine the degree of similarity, the Court must consider "all factors that could reasonably be expected to be perceived by and remembered by potential purchasers." *McGregor–Doniger, supra,* 599 F.2d at 1133. In this case, the Court must examine how the marks sound and how they appear.

The words TRANSAMERICA and Trans America are identical in sound. How the marks sound to the human ear is critical to the inquiry here because, by defendants' own admission, their main source of business is word-of-mouth referrals. Except with respect to answering the telephone by using the abbreviation "Trans America", however, there is no evidence that defendants use anything but their full name, Trans America Abstract Service, Inc., when they are dealing with customers. For example, there is no evidence that defendants' customers use the name "Trans America" when making reference to defendants. Nor is there evidence that during face-to-face transactions with customers, defendants refer to themselves as Trans America rather than the full corporate name.

The public's ability to distinguish the marks is more apparent by comparing how they appear in writing. First, defendants always use their full corporate name. There is no evidence that defendants' name is abbreviated when it is written. Second, defendants spell the corporate name in all capital letters; plaintiff's mark is spelled in lower case, except for the "t". Third, defendants' corporate name is two words, sometimes hypenated, whereas plaintiff's mark is one word. Fourth, the type face of marks are different. Defendants' corporate name employs sharp and angular letters; whereas plaintiff's lettering is rounded. Fifth, plaintiff always uses the mark

TRANSAMERICA in conjunction with its logo (a fanciful "T"), or its slogan ("The Power of the Pyramid is Working For You"), or a reproduction of its pyramid-shaped San Francisco headquarters, or a combination thereof. Defendants do not use any aids to help the public identify their name. Thus, with respect to how the marks sound and appear, there exists an issue of fact regarding the likelihood that the similarity of the marks will create confusion about the ultimate source of defendants' services.

With respect to the proximity of services it is important to note that defendants do not advertise in any medium. Defendants' sole avenue of business is word-of-mouth referrals from former customers. Plaintiff, on the other hand, advertises extensively in all mediums on a nationwide basis. As a result, the relevant geographic markets targeted by the parties are different— defendants' business is limited almost exclusively to Long Island.

There is no dispute that both plaintiff and defendants offer title insurance and title abstracting services. Defendants have raised an issue of fact, however, whether the manner in which the parties offer their services and the relevant geographical area mitigate the likelihood of consumer confusion. Defendants offer title abstracting, searching and examining services, and also issue title insurance but only as an independent agent of the insurance companies they represent. Plaintiff also issues title insurance, but under its own name. Plaintiff's abstracting services are offered under the TRANSAMERICA mark in its direct operations and through independent agents who perform work for insurance companies, including plaintiff. However, plaintiff's direct operations are limited to western states and its independent agents, even those in New York, are not permitted to employ the TRANSAMERICA mark in their company name. Thus, although the services are the same, the marketing of the services is performed under a host of names—TRANSAMERICA, and the names of the independent agents through which plaintiff offers title abstracting services; and Trans America, and the names of the insurance companies through which defendants' offer title insurance.

### C. *Bridging the Gap*

The fourth *Polaroid* factor "looks to whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, bridge the gap." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1227 (2d Cir.1987). The question in this case is whether plaintiff intends to offer title abstracting services in its own name. There is no evidence that plaintiff intends to expand its direct company operations, which offers abstracting services under plaintiff's mark, to the east coast. On the contrary, plaintiff's present strategy is to market its abstract services through agents. Although at the present time plaintiff employs the services of independent agents, it does intend to use exclusive agents at some time in the future. Exclusive agents would offer title insurance and title abstracting services on behalf of plaintiff only and accordingly, plaintiff may have an ownership interest in these exclusive agents. Consequently, there is some, although scant evidence that plaintiff may bridge the gap by providing title abstracting services in New York through exclusive agents. *See Lois Sportswear, supra,* 799 F.2d at 874 ("the form of [the senior user's] entry into the market segment might take is [not] especially relevant to the likelihood of confusion issue").

### D. *Actual Confusion*

The fifth *Polaroid* factor asks "whether any consumers had actually been confused" by virtue of the similarity of the marks. *Centaur Communications, supra,* 830 F.2d at 1227.

Plaintiff alleges three types of actual confusion have occurred: (1) misdirected telephone calls and letters; (2) inquiries from title insurance agents concerning the relationship of the parties; and (3) a letter from one Marvin Phillips.

The evidence plaintiff submits in support of the first type of actual confusion is an affidavit from Susan Cornwall, one of the plaintiff's senior vice presidents. The Court does not find this evidence persuasive. First, Ms. Cornwall is only reporting the hearsay declarations of her subordinates. No competent evidence was submitted to the Court demonstrating that telephone calls and letters were indeed intended for defendants but were referred erroneously to plaintiff. Second, there is no evidence that these misdirected communications were caused by consumer confusion rather than "secretarial carelessness," *United States Blind Stitch Machine Corp. v. Union Special Machine Co.*, 287 F.Supp. 468, 471 (S.D.N.Y.1968), or errors of other kind. *See Polaroid Corp. v. Polarad Electronics Corp.*, 182 F.Supp. 350, 354 (E.D.N.Y.1960), *aff'd*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Moreover, defendants disclaim receiving the misdirected correspondence that plaintiff alleges was forwarded to them.

The second type of alleged actual confusion involves inquiries from title insurance agents made when plaintiff was preparing to enter the New York market concerning the existence of a relationship between plaintiff and defendants. One inquiry was made of defendant Samuels. *See* Deposition of Barrett M. Samuels at 68. At least one other inquiry was directed at plaintiff. However, "[t]hat questions have been raised as to the relationship between firms is not evidence of actual confusion of their trademarks." *Electronic Water Conditions, Inc. v. Turbomag Corp.*, 221 U.S.P. Q. 162, 164 (T.T.A.B.1984). In any event, proof of two inquiries over the course of the twelve years that defendants have been in business is not significant. *See C.L.A. S.S. Promotions Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985).

 The final instance of actual confusion surrounds a letter sent by one Marvin Phillips to plaintiff. A few months after this action was commenced, plaintiff received a letter from Mr. Phillips, the client of one of defendants' customers. The letter, dated September 16, 1986 was addressed to the President of Transamerica Title Insurance in San Francisco, California. The letter complained that "[plaintiff's] subsidiary, Trans America Abstract Service, Inc., 185 Hillside Avenue, Williston Park, New York" was wrongfully withholding $2,500 in escrow. Mr. Phillips sent a copy of this letter to defendants as well as the Departments of Insurance for the States of New York and California. The New York State Department of Insurance wrote to Transamerica Title requesting an explanation. Although this is only a single instance of actual confusion, it is significant inasmuch as the letter prompted an investigation by the New York State Department of Insurance. Defendants' sole retort is that Mr. Phillips is not a "typical" customer or consumer—he is the principal of a corporate customer that sold real estate without the aid of a lawyer. Since in the overwhelming majority of real estate transactions, lawyers choose the title insurance services for their clients, defendants argue, the Court can consider only those instances where lawyers, not their clients, are actually confused. The Court rejects such a narrow reading of the actual confusion inquiry. Whether Mr. Phillips is characterized as typical or atypical, the fact remains uncontested that Mr. Phillips used defendants' services and was confused with regard to defendants' affiliation with plaintiff. The Lanham Act protects confusion of any kind—it is not limited to confusion suffered by "typical" customers. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F.Supp. 735, 745 (S.D.N.Y.1985), *aff'd*, 799 F.2d 867 (2d Cir.1986). The Court thus concludes that this factor must be resolved in plaintiff's favor.

### E. Defendants' Good Faith

 Plaintiff's registration of its mark was issued on July 4, 1967, eight years before defendants began using the Trans America name. Defendants do not deny that plaintiff's registration put them on constructive notice of plaintiff's rights, a fact that *"may* signal bad faith." *Mobil Oil v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987) (emphasis supplied).

Bad faith may also be inferred from defendants' continued use of the mark after plaintiff's objection. *Charles Schwab & Co. v. The Hibernia Bank*, 665 F.Supp. 800, 811 (N.D.Cal.1987).

■■■ However, defendant Samuels never heard of plaintiff or its subsidiary before adopting the mark. In addition, he has proffered a good faith explanation for the adoption of the mark: the name suggested a less localized business than the name of his former employer, Carle Place Service Corporation. Defendant Samuels also asked his lawyer to investigate the prior use of the name Trans America, unaware that such an investigation involved a federal trademark search. It is thus likely that defendant Samuels, although perhaps guilty of negligence, harbored no improper motive in adopting the corporate name. *See 815 Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d 643 649–50 (2d Cir. 1988). Accordingly, the Court must conclude that an issue of fact has been raised concerning defendants' bad faith.

### F. Quality of Defendants' Services

The next *Polaroid* factor that must be considered is the quality of defendants' services. The judicial construction of this factor inevitably puts the junior user of a mark in a no-win situation. If the junior user's product is inferior, then the senior trademark user is injured by the consumer's association of the inferior product with the senior user's mark. *See Hasbro, supra*, at 78. Alternatively, should the parties' services be of equal quality, then there exists an increased likelihood of consumer confusion. *See, e.g., Centaur Communications, supra*, 830 F.2d at 1228; *Lois Sportswear, supra*, 799 F.2d at 875.

Plaintiff does not quarrel with the quality of defendants' services. It argues, however, that the quality of defendants' title insurance services coupled with the use of the name Trans America supports a finding that there is a likelihood that customers will be confused about the source of the services. Under the prevailing case law in this Circuit, *see, e.g., Hasbro, supra*, at 78; *Banff, supra*, 841 F.2d at 492; *Centaur*

*Communications, supra*, 830 F.2d at 875; *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1007 (2d Cir.1983) (dissimilar quality lessens likelihood of confusion), the Court is compelled to conclude that this factor must be resolved in plaintiff's favor.

### G. Purchaser Sophistication

■■■ The final *Polaroid* factor considers the "sophistication of the consumers in the relevant market." *Centaur Communications, supra*, 830 F.2d at 1228. As the theory goes, the less sophisticated the consumer, the greater the likelihood of confusion. *See Hasbro, supra*, at 78; *Centaur Communications, supra*, 830 F.2d at 1228; *but see Lois Sportswear, supra*, 799 F.2d at 875 (typical purchaser of designer jeans is sophisticated but nevertheless "most likely" to believe there exists an association between the junior and senior user of a mark).

There is no evidence in the record suggesting that the relevant purchasers are the public at large. Plaintiff admits that defendants' customers consist primarily of lawyers and real estate agents. *See* Plaintiff's Statement Pursuant to Local Rule 3(g), ¶¶ 25, 46 at 5, 8. Plaintiff does not dispute that these customers are sophisticated. Rather, it argues that the sophistication of the customers does not eliminate, and indeed may aggravate, the likelihood that they would be confused about the source of defendants' services. Plaintiff's theory has indeed been sanctioned in certain circumstances. *See Mobil Oil Corp., supra*, 818 F.2d at 259–60; *Lois Sportswear, supra*, 799 F.2d at 875; *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1314–42 (2d Cir.1975).

Defendants, however, have submitted evidence tending to establish that the sophistication of the customers decreases the likelihood of confusion. Specifically, defendants submit affidavits from persons knowledgeable in the title insurance service field and an affidavit from one of defendants' customers, a real estate lawyer, who maintain that, due to the prevalence of title

insurance companies and unrelated title abstracting companies bearing similar names,[2] they are accustomed to distinguishing between the companies and are aware that the companies are not associated. Additional evidence has been submitted suggesting that the purchase of title insurance or title abstracting services is a deliberate choice based on personal relationships and prior experience with the provider of those services, rather than impulsive reflex. *See McGregor–Doniger, supra,* 599 F.2d at 1137. The Court thus must conclude, based on the evidence submitted by defendants, that there exists an issue of fact, not whether the relevant customers are sophisticated, but whether sophistication decreases the likelihood of confusion—the ultimate question that must be resolved.

### H. *Conclusion*

■ "The bottom line on a motion for summary judgment is not how many factors favor each side but whether a reasonable trier of fact might differ as to likelihood of confusion." *Physicians Formula Cosmetics, Inc. v. West Coast Cabot Cosmetics, Inc.,* 857 F.2d 80, 85 (2d Cir. 1988). Based on an evaluation of the *Polaroid* factors, the Court concludes that defendants have raised material facts precluding a determination as a matter of law that there exists a likelihood of confusion. Accordingly, plaintiff's motion for summary judgment on its Lanham Act claims must be denied.

## IV. State Claims

Plaintiff also seeks summary judgment on its claims based on New York's anti-dilution law, N.Y. Gen.Bus.L. § 368–d and common law unfair competition.

### A. *Anti–Dilution*

■ N.Y. Gen.Bus.L. § 368–d provides: Likelihood of injury to business reputation or of dilution of the distinctive quali-

ty of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Proving dilution of a mark under this statute requires: (1) an "extremely strong mark" *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983) (citing *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 545–46, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166–67 (1977)) (listing examples such as DUPONT, BUICK and KODAK); and (2) likelihood of dilution or a "whittling down" of the identity or reputation of the mark. *Sally Gee, supra,* 699 F.2d at 625. A third factor, which is considered relevant but not necessary, is the predatory intent of the junior user. *See id.* at 626.

As the discussion above demonstrates, the Court is unable to conclude as a matter of law that plaintiff's mark is so distinctive as to warrant protection under this statute. *See Pan American World Airways, supra,* 648 F.Supp. at 1040. Moreover, the question of defendants' intent, is "ill-suited for summary resolution." *Lord Jeff Knitting Co. v. Warnaco, Inc.,* 594 F.Supp. 579, 583 (S.D.N.Y.1984).

### B. *Unfair Competition*

■ "The essence of an unfair competition claim under New York law is that defendant has misappropriated the labors and expenditures of another.... Central to this notion is some element of bad faith." *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980) (citations omitted). Because the "central" inquiry—defendants' bad faith—is in dispute, resolution of this claim must be reserved for trial.

---

**2.** The names of these unrelated title insurance and title abstracting companies include: American Title Insurance Co. and American Abstract Corp.; Commonwealth Land Title Insurance Co. and Commonwealth Abstract, Co., Inc.; and Safeco Title Insurance Corp. and Safeco Abstract Corp. *See* Declaration of Richard Marcus ¶ 6 at 3.

## CONCLUSION

Plaintiff's motion for summary judgment must be and hereby is denied in its entirety.