**VOLVO NORTH AMERICA CORPORATION, International Merchandising Corporation, and Proserv, Inc., Plaintiffs,**

v.

**MEN'S INTERNATIONAL PROFESSIONAL TENNIS COUNCIL, M. Marshall Happer III, and Philippe Chatrier, Defendants.**

**MEN'S INTERNATIONAL PROFESSIONAL TENNIS COUNCIL and M. Marshall Happer III, Counterclaimants,**

v.

**VOLVO NORTH AMERICA CORPORATION, International Merchandising Corporation, and Proserv, Inc., Counterclaim–Defendants,**

and

**Donald L. Dell, Raymond S. Benton, Dell, Benton & Falk, Mark H. McCormack, International Merchandising Group, International Management Inc., Transworld International Inc., and A.B. Volvo, Additional Counterclaim–Defendants.**

No. 85 Civ. 2959 (KTD).

United States District Court,
S.D. New York.

May 18, 1988.

Rogers & Wells, New York City (James J. Maloney, Michael F. Coyne, Margaret M. Vande Wiele, Guy C. Quinlan, of counsel), for plaintiff/counterclaim defendant Volvo North America Corp. and additional counterclaim defendant A.B. Volvo.

Williams & Connolly, Washington, D.C. (Robert S. Litt, Jeffery R. Berry, Mark S. Levinstein, William R. Murray, Jr., of counsel), and Lloyd I. Isler, P.C., New York City, for plaintiff ProServ, Inc. and additional counterclaim defendants Donald L. Dell, Raymond S. Benton, and Dell, Benton & Falk.

Lloyd I. Isler, P.C., New York City, for additional counterclaim defendants Intern. Merchandising Corp., Mark H. McCormack, Intern. Merchandising Group, Intern. Management Inc. and Transworld Intern. Inc.

Simpson Thacher & Bartlett, New York City (Roy L. Reardon, Michael J. Chepiga, Julie R. Fenster, of counsel), for defendants-counterclaimants Men's Intern. Professional Tennis Council and M. Marshall Happer, III.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiffs/counterclaim-defendants Volvo North America Corporation, International Merchandising Corporation, and ProServ, Inc. and counterclaim-defendants Donald L. Dell, Raymond S. Benton, Dell, Benton & Falk, Mark H. McCormack, International Merchandising Group, International Management Inc., Transworld International Inc., and A.B. Volvo move, *inter alia,* to dismiss defendants/counterclaimants Men's International Professional Tennis Council's and M. Marshall Happer III's counterclaims against them. For the reasons that follow, counterclaims 1 through 4, 6, 13, and 14 are dismissed. Counterclaims 5 and 7 through 12 are dismissed with leave to replead granted.

## FACTS

The background facts of this case are set forth in detail in my Memorandum and Order of August 10, 1987 in this case, 678 F.Supp. 1035 (S.D.N.Y.1987). For purposes of this Memorandum and Order, I will only mention those facts deemed pertinent to the motions at issue.

The Men's International Professional Tennis Council ("MIPTC") is an unincorporated body that organizes, schedules, and administers the Grand Prix Circuit series of men's professional tennis events ("Grand Prix"). Counterclaims and Answer at ¶ 6. M. Marshall Happer III ("Happer") is MIPTC's administrator, and has held that position since 1981. *Id.* at ¶ 7.

A.B. Volvo is a Swedish corporation primarily engaged in the production of automobiles, trucks, and buses. Volvo North America Corporation is a wholly-owned subsidiary of A.B. Volvo, primarily engaged in the distribution of cars, trucks, and buses in the United States. Both A.B. Volvo and Volvo North America Corporation will be collectively referred to as "Volvo". Volvo has sponsored Grand Prix tennis events since 1972, and was the overall sponsor of the Grand Prix from 1980 through 1984. *Id.* at ¶ 8.

ProServ, Inc. ("ProServ") is a Washington, D.C. firm that owns, produces, promotes, and televises men's professional tennis events, represents men's professional tennis players and other athletes, and provides marketing and sponsorship opportunities for companies wishing to sponsor men's professional tennis events. *Id.* at ¶ 9. Raymond S. Benton ("Benton") is president of ProServ, and a partner of Dell, Benton & Falk, the law firm that represents ProServ. *Id.* at ¶¶ 12, 13; Memorandum of Plaintiff/Counterclaim Defendant Volvo North American Corporation in Support of a Motion to Dismiss Defendants' Counterclaims at 3. Donald L. Dell is the majority owner of ProServ, and is also a partner of Dell, Benton & Falk. *Id.* at ¶¶ 11, 13. Dell and the firm of Dell, Benton & Falk will be collectively referred to

as "Dell." Since 1972, ProServ has acted as Volvo's agent for its marketing endeavors in men's professional tennis. *Id.* at ¶ 58.

International Management Group is the corporate parent of the three corporations owned by Mark H. McCormack ("McCormack"): (1) International Merchandising Corporation, a corporation based in Cleveland, Ohio and engaged in essentially the same tennis-related activities as ProServ; (2) International Management Inc.; and (3) Transworld International Inc., a sports marketing and merchandising organization. *Id.* at ¶ 14. International Management Group, International Merchandising Corporation, International Management Inc., and Transworld International Inc. will be collectively referred to as "IMG".

MIPTC and Happer assert fourteen counterclaims against Volvo, ProServ, Benton, Dell, McCormack, and IMG:

(1) MIPTC alleges that all counterclaim defendants contracted, combined and conspired to restrain trade, in violation of the Sherman Act, 15 U.S.C. § 1 (1982), in the following markets: (a) the worldwide market for men's professional tennis players' services ("the players market"); (b) the world wide market for producing men's professional tennis events ("the events market"); (c) the worldwide, United States, and local markets for television broadcast rights of men's professional tennis events ("the television market").[1] Counterclaims and Answer at ¶¶ 118–22.

(2) MIPTC alleges that all counterclaim defendants combined and conspired to monopolize, in violation of the Sherman Act, 15 U.S.C. § 2 (1982), the players, events, and television markets. *Id.* at ¶¶ 123–26.

(3) MIPTC alleges that Volvo, ProServ, Dell, and Benton made false and mislead-

ing written and broadcast statements regarding Volvo's Grand Prix sponsorship which constitute false descriptions and representations and created a false designation of origin in violation of the Lanham Act. 15 U.S.C. § 1125(a) (1982). *Id.* at ¶¶ 127–29.

(4) MIPTC alleges that Volvo, ProServ, Dell, and Benton adopted a mark so similar to the Grand Prix mark as to create a likelihood of confusion and dilute the distinctive quality of the Grand Prix mark in violation of the New York state antidilution statute. N.Y. Gen.Bus.Law § 368–d (McKinney 1984). *Id.* at ¶¶ 130–32.

(5) MIPTC alleges that Volvo, ProServ, Dell, and Benton made false and misleading written and broadcast statements regarding Volvo's Grand Prix sponsorship which create a likelihood of confusion, misappropriate rights belonging to MIPTC, and constitute common law unfair competition. *Id.* at ¶¶ 113–35.

(6) MIPTC alleges that ProServ, Dell, and Benton participate in the affairs of men's professional tennis through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1964(c) (1982). The pattern of racketeering activity alleged includes mail fraud, in violation of 18 U.S.C. § 1341 (1982), and wire and television fraud, in violation of 18 U.S.C. § 1343 (1982). *Id.* at ¶¶ 136–38.

(7) MIPTC alleges that Volvo has breached the overall sponsorship agreement between them, dated September 25, 1979, by failing to pay amounts owed under that agreement. *Id.* at ¶¶ 139–41.

(8) MIPTC alleges that Volvo has breached its agreement to be a Grand Prix sanction-holder[2] by failing to abide by the

---

**1.** Counterclaimants allege separate markets for the worldwide services of men's professional tennis players in general, and for the services of top-ranked men's professional tennis players. They likewise allege separate markets for worldwide production of men's professional tennis events in general, and for major men's professional tennis events. Therefore, counterclaimants assert restraint of trade in five, not just three relevant markets. I disagree. While the stakes, volume, and publicity of top-ranked

men's professional tennis players' services and production of the major events that they play in might be exponentially larger than those of lesser known players and tennis events, they nevertheless do not constitute separate markets.

**2.** Men's professional tennis consists of two types of events: those organized by the MIPTC ("sanctioned events"), and those having no relationship to MIPTC ("special events"). The owner of any sanctioned event, who bears complete fi-

Grand Prix promotional and sponsorship rules. The promotional breaches alleged include failing to identify Nabisco Brands, Inc. ("Nabisco") prominently, or in some instances at all, as the overall Grand Prix sponsor on all promotional, advertising, and other materials in connection with the event. The sponsorship breach alleged is that Volvo sponsored a "circuit within a circuit" of Grand Prix events. *Id.* at ¶¶ 142–44.

(9) MIPTC alleges that Volvo has breached its overall Grand Prix sponsorship agreement by failing to abide by the Grand Prix promotional and sponsorship rules, and claims the same breaches as those made out in counterclaim 8. *Id.* at ¶¶ 145–47.

(10) MIPTC alleges that Volvo, ProServ, Dell, and Benton breached their agreements to provide full financial disclosure concerning the Volvo Masters during those years that Volvo was the overall sponsor of the Grand Prix and of the Masters tournaments. *Id.* at ¶¶ 148–50.

(11) MIPTC alleges that Volvo and ProServ breached their January 1985 agreement to cooperate with MIPTC's reasonable promotional activities. *Id.* at ¶¶ 151–53.

(12) MIPTC alleges that ProServ has breached its agreement to be a Grand Prix sanction-holder by failing to abide by Grand Prix promotional and sponsorship rules. The promotional breaches alleged include failing to identify Nabisco prominently, or in some instances at all, as the overall Grand Prix sponsor on all promotional, advertising, and other materials in connection with the event. The sponsorship breach alleged is that Volvo sponsored a "circuit within a circuit" of Grand Prix events. *Id.* at ¶¶ 154–56.

(13) Happer alleges that Dell, Benton, Volvo, ProServ, and McCormack have defamed him, have disparaged him in his profession, and have exposed him to public ridicule and contempt within the tennis and legal communities. The specific acts allegedly causing such harm include their false statements to the press that Happer dealt with Volvo dishonestly, unfairly, and in bad faith, and that Happer lied, breached confidences, and conducted a fraudulent bidding process for Grand Prix sponsorship rights. *Id.* at ¶¶ 157–64.

(14) MIPTC alleges that Dell, Benton, Volvo, and ProServ have defamed it. The specific acts alleged include their false statements to the press and others accusing MIPTC of greed, dishonesty, bad faith, and fraud. *Id.* at ¶¶ 165–74.

MIPTC and Happer essentially maintain that Volvo, ProServ, Dell, Benton, IMG, and McCormack "have achieved and maintain their power in men's professional tennis and have damaged the MIPTC and its constituents by means of numerous improper, illegal and anticompetitive acts and practices. Moreover, Dell, Benton and ProServ continue to run the affairs of men's professional tennis through a pattern of illegal acts and practices." Counterclaims and Answer at ¶ 116.

Volvo, ProServ, Dell, Benton, IMG, and McCormack each move to dismiss all of the counterclaims against them.

## DISCUSSION

For purposes of the following analysis, I assume that MIPTC and Happer properly assert *in personam* jurisdiction over AB Volvo, the Swedish parent corporation of Volvo North America Corporation. Therefore, the motions of Volvo and AB Volvo will be deemed one motion for purposes of this Memorandum. I also assume the MIPTC has standing to properly assert antitrust claims on behalf of its constituents.

1. *Volvo's Motion to Dismiss the Counterclaims*

Volvo moves, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all of the counterclaims alleged by MIPTC and Happer against Volvo for failure to state a claim upon which

---

nancial responsibility for all aspects of the tournament, is actually a licensee who has obtained a sanction from MIPTC. The owner can retain the sanction and, for some consideration, assign all rights and responsibilities for conducting the event to some other person. In such a case, the owner remains the sanction-holder, and the assignee becomes a *de facto* owner of the event.

relief can be granted; and, pursuant to Fed.R.Civ.P. 12(b)(1), to dismiss the first and second counterclaims for lack of subject matter jurisdiction; and, pursuant to Fed.R.Civ.P. 12(f), to strike the allegations of fraud included in paragraphs 81 through 83, 86, 88, 89, and 102 from the Counterclaims and Answer as immaterial, impertinent, and scandalous.

This discussion will address the counterclaims in the order that they are alleged against Volvo. Counterclaims 1 and 2 allege that Volvo violated federal antitrust law. Counterclaims and Answer at ¶¶ 118–126. Federal antitrust law prohibits contracts, combinations and conspiracies in restraint of interstate trade or commerce as well as attempts, combinations, or conspiracies to monopolize interstate trade or commerce. 15 U.S.C. §§ 1, 2 (1982) (the Sherman Act).[3] Standing to sue for antitrust violations is conferred upon civil litigants by the Clayton Act. 15 U.S.C. §§ 15, 26 (1982).[4] "In order to prevail in a private antitrust action, a plaintiff must show that a violation of the antitrust laws occurred, that the plaintiff was damaged as a result, and the amount of damages." *Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 408 F.Supp. 1251, 1268 (S.D.N.Y.1976).

▉ Counterclaim 1 attempts to establish that Volvo and ProServ combined and conspired to restrain trade in the players, events, and television markets, in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. A plaintiff must establish three essential elements in order to recover in a civil action under Section 1. The first element is that the defendant entered into a contract, combination, or conspiracy. The second is that that contract, combination, or conspiracy restrained interstate trade or commerce. 15 U.S.C. § 1; *International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 793 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). These first two elements do not require proof of defendants' specific intent to create a monopoly. Rather, the required showing is that " 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement,' and that the anticompetitive effects of the alleged conspiracy outweigh the procompetitive effects." *International Distribution*, 812 F.2d at 793 (quoting *Michelman v. Clark–Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.1976) (quoting *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946))). The third element that a plaintiff must establish is that injury to the plaintiff's business or property was proximately caused by the defendant's antitrust violation. 15 U.S.C.

**3.** Section 1 of the Sherman Act provides in pertinent part that:

[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (1982).
Section 2 of the Sherman Act provides in pertinent part that:

[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony.

15 U.S.C. § 2 (1982).

**4.** Section 15 of the Clayton Act provides in pertinent part that:

[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy.

15 U.S.C. § 15 (1982).
Section 26 of the Clayton Act provides in pertinent part that:

[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue.

15 U.S.C. § 26 (1982).

§ 15; *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 41 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987).

MIPTC's first basis for its claim that Volvo and ProServ violated Section 1 consists of allegations that, during the period following MIPTC's rejection of Volvo's Grand Prix sponsorship offer, Volvo and ProServ participated in a scheme to dominate and control men's tennis. The scheme alleged consists of issuing false and misleading information to the press and to the Grand Prix tournament organizers in order to maintain control over the Grand Prix sponsorship. Two separate types of misinformation are alleged. The first type is press releases, issued in both the United States and Sweden, which overstated the value of the Volvo sponsorship offer rejected by MIPTC and stated that MIPTC, Happer and Chatrier (MIPTC's chairman) dealt with Volvo in bad faith. The second type is that disseminated to Grand Prix tournament organizers which overstated the value of the Volvo sponsorship offer and indicated that the offer was still outstanding. The alleged purpose for issuing the first type of information was to eliminate potential competitors for Grand Prix sponsorship and to secure Volvo's renewal of that sponsorship. The alleged purpose for issuing the second type of information was to circumvent the MIPTC and collect support for Volvo's sponsorship offer directly from Grand Prix tournament organizers. Counterclaims and Answer at ¶¶ 81–83, 86.

The Supreme Court has stated that conspiracies should not be inferred "when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." *Matsushita Elec. Indus Co. v. Zenith Radio Corp.,* 475 U.S. 574, 593, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986).

■ Accepting MIPTC's allegations as true, and even assuming that a conspiracy between Volvo and ProServ to disseminate false information may be plausibly inferred from the fact that both of them allegedly did so, MIPTC does not assert sufficient facts to state a Section 1 violation. Volvo and ProServ did not obtain the anticompetitive result allegedly sought; Nabisco, not Volvo, obtained the Grand Prix sponsorship, and MIPTC alleges no anticompetitive effect to the relevant markets inflicted by the allegedly false statements. Nowhere does MIPTC claim that it sustained damages to its business or property as a proximate result of such a conspiracy between Volvo and ProServ.

■ MIPTC next alleges that Volvo and ProServ violated Section 1 by exploring the possibility of forming a men's professional tennis circuit outside the Grand Prix if Volvo did not obtain a renewed Grand Prix sponsorship. *Id.* at ¶¶ 81, 87. Were Volvo and ProServ to establish an independent men's professional tennis circuit, it would compete directly with MIPTC and the Grand Prix. Clearly, this allegation is insufficient to state a Section 1 violation.

■ MIPTC next alleges that Volvo violated Section 1 by conducting a campaign "to discourage all other potential bidders, by means of false and fraudulent misstatements and threats and intimidation, from pursuing their interest in becoming the next sponsor of the Grand Prix." *Id.* at ¶ 88. ProServ, on behalf of Volvo, is alleged to have participated in and facilitated Volvo's campaign by (1) falsely suggesting to Seiko and Dentsu that Volvo was still involved in Grand Prix sponsorship; (2) misrepresenting Volvo's renewal bid; and (3) stating that Dentsu, by seeking other potential Grand Prix sponsors, might cause problems between itself and ProServ. MIPTC alleges that the latter statement was sufficient to prevent further action by Dentsu on behalf of Seiko, because ProServ was involved with both Seiko and Dentsu in providing players and endorsements at Seiko's Tokyo Grand Prix event, and with Dentsu at another professional tennis event. *Id.* at ¶¶ 88–90. MIPTC also alleges that ProServ, in its efforts to discourage Nabisco from seeking the Grand Prix sponsorship and on behalf of Volvo, falsely stated to Nabisco that the cost of acquiring the sponsorship would exceed $25 million. Nabisco subsequently informed MIPTC that it was not interested in

the sponsorship at that price. Nonetheless, Nabisco's interest was later revived. *Id.* at ¶¶ 91–93.

Accepting MIPTC's allegations as true, and assuming that a conspiracy between Volvo and ProServ to disseminate false information to Seiko, Dentsu, and Nabisco may be plausibly inferred from the fact that both of them allegedly did so, MIPTC does not allege sufficient facts to state a Section 1 violation. Once again, Volvo and ProServ did not obtain the anticompetitive result allegedly sought, and MIPTC asserts neither an alternative anticompetitive effect inflicted on the relevant markets by the allegedly false statements, nor its own proximate injury from such a conspiracy.

■ MIPTC next accuses Volvo and ProServ of violating Section 1 by pressuring and coercing individual MIPTC Council members to support Volvo in its Grand Prix sponsorship bid. *Id.* at ¶ 81. MIPTC alleges that Volvo combined with Dell to threaten Happer's job if MIPTC did not accept Volvo's sponsorship offer, thereby intimidating MIPTC into not opposing Volvo's sponsorship plans and projects. *Id.* at ¶ 117(20). MIPTC also alleges that Volvo has combined with ProServ, Dell, and Benton to threaten to prohibit MIPTC from conducting the Masters tournament at its established time and place, thereby coercing MIPTC into renewing Volvo's sponsorship bid. *Id.* at ¶ 117(21).

Accepting MIPTC's allegations as true, and assuming that a conspiracy between Volvo and ProServ to pressure and coerce individual MIPTC members to support Volvo's sponsorship renewal may plausibly be inferred from the facts pled, MIPTC does not allege sufficient facts to state a Section 1 violation. Again, Volvo and ProServ did not obtain the anticompetitive result allegedly sought, and MIPTC alleges neither an alternative anticompetitive effect inflicted on the relevant markets by the allegedly false statements, nor its own proximate injury from such a conspiracy.

■ MIPTC next asserts that Volvo and ProServ started an unfounded whispering campaign against MIPTC. *Id.* at ¶ 81. Because it is not clear exactly what is meant by this allegation, I can neither determine whether the anticompetitive effects of a "whispering campaign" outweigh its procompetitive effects, nor how MIPTC may have been proximately injured by it, and what, if any, damages MIPTC may have sustained. This allegation is insufficient to state a cause of action under Section 1.

MIPTC next accuses Volvo and ProServ of launching a misleading and deceptive program called "Volvo Tennis" after the Grand Prix sponsorship was awarded to Nabisco. Volvo Tennis was allegedly staffed by the same people and located at the same offices as the "Volvo Grand Prix" program in place when Volvo was the overall Grand Prix sponsor. *Id.* at ¶ 104. The alleged purpose of such staffing and location was to undermine Nabisco and unfairly promote the Volvo name. *Id.* at ¶ 81. To support this claim, MIPTC points to the "Volvo Tennis" logo which was jointly designed and publicized by Volvo, ProServ, Dell, and Benton. MIPTC claims that this logo is confusingly similar to the "Volvo Grand Prix" logo which Volvo used during its overall Grand Prix sponsorship. *Id.* at ¶ 105. MIPTC makes out four allegations in support of the asserted conspiracy to mislead. First, Volvo and ProServ allegedly issued numerous mailings and placed numerous advertisements in national periodicals bearing the "Volvo Tennis" logo in order to defraud MIPTC, the Grand Prix events, and Nabisco, and to mislead and confuse the public. *Id.* at ¶¶ 107, 117(27). Second, Volvo, with ProServ, Dell, and Benton, allegedly placed prominent and misleading banners and graphic displays at Grand Prix tournaments for exposure during television broadcasts. *Id.* at ¶ 117(28). Third, Volvo combined with ProServ, Dell, and Benton to use economic coercion against Grand Prix events to persuade them to change the names of their events to reflect the "Volvo Tennis" name. *Id.* at ¶ 117(34). Fourth, Volvo and ProServ allegedly used television broadcasts to further promote the "Volvo Tennis" program and to create the false impression that Volvo was still the overall Grand Prix sponsor. *Id.* at ¶ 111.

■ Assuming that Volvo and ProServ did combine to create and promote the "Volvo Tennis" program, MIPTC does not describe the anticompetitive effects of the program, does not describe the damage caused to MIPTC by the program, and does not even suggest how its anticompetitive effects might outweigh its procompetitive effects. Surely Volvo was required to change the name of its professional tennis sponsorship program from "Volvo Grand Prix" when it was no longer the overall Grand Prix sponsor, but it was not required to cease all involvement in professional tennis while not involved in the overall Grand Prix sponsorship. MIPTC simply states that Volvo and ProServ have combined to economically coerce Grand Prix events to change the names of their events to reflect the "Volvo Tennis" name, but does not allege that the Grand Prix events referred to actually changed their names to reflect the "Volvo Tennis" name, does not suggest any resultant anticompetitive effect, and does not state how "Volvo Tennis" might have harmed MIPTC. These allegations are not sufficient to make out a Section 1 violation.

■ Finally, MIPTC asserts that Volvo violated Section 1 by combining with ProServ, Dell, and Benton to coerce MIPTC into giving Volvo a sanction for a Grand Prix event in Chicago by threatening to, and taking steps to, prevent MIPTC from staging the Masters tournament in its established time and place in the years after 1985. *Id.* at ¶ 117(32). Accepting MIPTC's allegations as true, and assuming that a conspiracy between Volvo and ProServ to coerce MIPTC into entering a sanctioning agreement with Volvo may plausibly be inferred from the fact that the agreement was made, MIPTC again fails to allege how it may have been harmed or what, if any, damages may have been sustained by it due to the sanctioning agreement. The allegations are not sufficient to state a Section 1 violation.

■ Counterclaim 2 alleges that Volvo and ProServ combined and conspired to monopolize the players, events, and television markets in violation of Section 2 of the Sherman Act. Counterclaims and Answer at ¶¶ 123–26; 15 U.S.C. § 2.

The offense of monopolization under section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

*Southern Pacific Communications Co. v. American Telephone & Telegraph Co.,* 740 F.2d 980, 1000 (D.C.Cir.1984) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). The monopoly power required by the first element is 'the power to control prices or exclude competition.' " *Southern Pacific,* 740 F.2d at 1000 (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956)). Such

" '[e]xclusionary' conduct is conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power."

*Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir.1983) (quoting 3 P. Areeda and D. Turner, *Antitrust Law* ¶ 626 at 83 (1978)); *Southern Pacific,* 740 F.2d at 999 n. 19. "The issue is whether the defendant's conduct is reasonable in light of its business needs, or whether it unreasonably excludes competition." *Southern Pacific,* 740 F.2d at 999 n. 19. The second element requires some showing that the monopoly at issue is an unlawful one; lawful monopolies are not prohibited by Section 2. "The lawful monopolist should be free to compete like everyone else; otherwise the antitrust laws would be holding an umbrella over inefficient competitors." *Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 797 F.2d 370, 375 (7th Cir.1986). A showing that the defendant intends to harm its competitive rivals is not sufficient to satisfy the second element of Section 2.

" '[I]ntent to harm' [rivals] without more offers too vague a standard in a world where executives may think no further than 'Let's get more business,' and long-term effects on consumers depend in large measure on competitors' responses." Neither is "intent to do more business," which amounts to the same thing, [a useful standard in antitrust]. Vigorous competitors intend to harm rivals, to do all the business if they can. To penalize this intent is to penalize competition." *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1338–39 (7th Cir.1986) (quoting *Barry Wright*, 724 F.2d at 232).

■ MIPTC alleges that the scheme, discussed above, between Volvo and ProServ to dominate and control men's tennis constitutes a combination and conspiracy to monopolize the players, events, and television markets in violation of Section 2. However, nowhere in the counterclaims does MIPTC allege that Volvo and ProServ possess monopoly power in the players, events, or television markets; neither can that allegation be inferred from the facts alleged in the counterclaims. While the facts alleged in the counterclaims may describe attempts by Volvo and ProServ to exclude competition for the Grand Prix sponsorship, the fact that Volvo did not obtain the Grand Prix sponsorship it sought demonstrates that Volvo and ProServ do not possess that power. It cannot be said that the conduct alleged in the counterclaims "reasonably appear[ed] capable of making a significant contribution to creating or maintaining monopoly power." *Barry Wright*, 724 F.2d at 230.

■ Even assuming that Volvo and ProServ possess monopoly power in the relevant markets, MIPTC nowhere distinguishes their acquisition of that power from the historic development of men's professional tennis and the history of Volvo's

involvement in it. As alleged in the counterclaims, Volvo and ProServ established their positions in the players, events, and television markets largely as consequences of the recent historical development of the sport of men's professional tennis. As alleged in the counterclaims, the fact that Volvo and ProServ acted with the intent to harm their rivals—to "bury Nabisco," Counterclaims and Answer at ¶ 99, and to make the public "think everything in tennis is Volvo," *id.* at ¶ 100—is not sufficient to make out a claim of an unlawful monopoly. *Ball Memorial*, 784 F.2d at 1338–39; *Barry Wright*, 724 F.2d at 232. The allegations in the counterclaims are insufficient to state a Section 2 violation against Volvo.

Counterclaim 3 alleges that Volvo made false and misleading written and broadcast statements which constitute false descriptions and representations and created a false designation of origin in violation of the Lanham Act. Counterclaims and Answer at ¶¶ 127–29; 15 U.S.C. § 1125(a).[5]

■ Section 1125(a) protects both registered and unregistered trademarks against false designation of origin and false description or representation. *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1220 (2d Cir.1987); *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 212 (2d Cir. 1985). Analysis of Section 1125(a) protection requires two steps: a preliminary determination whether the mark at issue is entitled to protection and, if so, what level of protection; and a determination whether confusion is likely to occur between the marks at issue. *Centaur*, 830 F.2d at 1220; *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir (1986); *Thompson*, 753 F.2d at 212–13.

There are four classes of protected trademarks. "Arrayed in an ascending order which roughly reflects their eligibility to

---

**5.** The Lanham Act provides in relevant part that:

> [a]ny person who shall ... use in connection with any goods or services, ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent

the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action by ... any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a) (1982).

trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Lois*, 799 F.2d at 871 (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)).

> Generic terms—"the common descriptive name of an article or substance" [or service]—are ineligible for any trademark protection. Descriptive marks, those "describ[ing] the qualities, ingredients, effects or other features of the product [or service] naturally and in ordinary language" are protectible only where secondary meaning can be established. Suggestive terms require "imagination, thought and perception to reach a conclusion as to the nature of goods", and are eligible for protection without proof of secondary meaning. Finally, arbitrary or fanciful marks "enjoy all the rights accorded to suggestive terms as marks—without the need of debating whether the term is 'merely descriptive' and with ease of establishing infringement."

*Thompson*, 753 F.2d at 212–13 (quoting 15 U.S.C. § 1064(c) (1982 & Supp. IV 1986), 3 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies*, § 18.05 at 17 (4th ed. 1983), *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y. 1968), *Abercrombie*, 537 F.2d at 11, respectively) (footnotes and citations omitted).

After a mark's eligibility for protection has been determined, a court must address the ultimate inquiry: "whether there exists a 'likelihood that an appreciable number of ordinarily prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods [or services] in question.'" *Thompson*, 753 F.2d at 213 (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). A court determines whether a likelihood of confusion exists by evaluating a number of factors:

1. The strength of the mark at issue;
2. The degree of similarity between the marks;
3. The proximity of the products or services at issue;
4. The likelihood that the senior user will bridge the gap;
5. Actual confusion;
6. The junior user's good or bad faith in adopting the mark;
7. The quality of the respective goods or services;
8. The sophistication of the relevant consumers;
9. Balancing the conflicting interests of the parties involved;
10. The nature of the senior user's priority;
11. Any delay by the senior user in asserting its claim;
12. The harm to the junior user compared to the benefit to the senior user that would result from the requested injunction.

*Thompson*, 753 F.2d at 213–24.

MIPTC alleges that Volvo's use of the phrase "Volvo Tennis," the "Volvo Tennis" logo, the phrase "linking the world's great tennis events through television, and numerous false and misleading written and broadcast statements about the Volvo Tennis program and the Grand Prix constitute violations of the Lanham Act. MIPTC asserts that these statements, because they incorrectly represented that Volvo continued to be the overall Grand Prix sponsor after January 1985, that Volvo sponsored a "circuit within a circuit," and that "Volvo Tennis" was somehow related to the Grand Prix, created a likelihood of consumer confusion. Counterclaims and Answer at ¶ 128.

MIPTC alleges that the "Volvo Tennis" logo is confusingly similar to the "Volvo Grand Prix" logo used by Volvo while it was the overall Grand Prix sponsor. MIPTC further asserts that Volvo's use of the "Volvo Tennis" logo at a time when Volvo was still the overall Grand Prix sponsor was wrongful, misleading, and intended to create the impression the "Volvo Tennis" was connected with the Grand Prix.

Counterclaims and Answer at ¶ 105. Examples of the alleged improper use include advertisements in the January 8, 1985 issue of *New York Magazine,* in the 1985 Masters' Tournament program, *id.* at ¶¶ 107, 117(26) and in the names of the individual Grand Prix events it sponsored. *Id.* at ¶ 110.

MIPTC further alleges that during the television broadcasts of the Memphis finals, a Grand Prix event sponsored by Volvo, promotional announcements stated that the "program [was] made possible by grants from Volvo, sponsors of Volvo Tennis, linking the world's great tennis events through television,...." *Id.* at ¶ 111. MIPTC claims that this phrase was "consciously patterned after the phrase approved by the MIPTC to describe the Grand Prix: 'linking the world's official tennis tournaments,' " *id.,* and that its use intentionally caused confusion regarding whether Volvo was still the overall Grand Prix sponsor and whether Volvo sponsored a "circuit within a circuit." *Id.* at ¶¶ 111, 117(31). MIPTC cites the following to support its claim that these tactics created confusion:

1. The February 7, 1985 *Tennis Week* described confusion caused by the use of the "Volvo Tennis" logo used at the beginning of the telecast of a Philadelphia Grand Prix event, and by the fact that Dell was an announcer on the broadcast.

2. Both the April 3, 1985 New York *Daily News* and *The New York Times* of April 8, 1985 referred to the "Volvo Grand Prix," approximately three months after Nabisco became the overall Grand Prix sponsor. *Id.* at ¶ 112.

■ Because the "Volvo Tennis" mark involves the corporate name "Volvo," it is clearly not a generic mark. Rather, "Volvo" is arbitrary or fanciful because it is based on an unrelated corporate proper name. "Tennis" is a generic term describing in simple language the product represented by "Volvo Tennis." Therefore, "Volvo Tennis" appears to be a descriptive mark, falling somewhere between the generic and arbitrary ends of the trademark

spectrum, and entitled to some middle level of protection. It describes the features of the product it represents in ordinary language: tennis events sponsored by a corporate entity named Volvo. The mark is therefore entitled to trademark protection only if secondary meaning of the mark can be established.

> A mark acquires secondary meaning when "it [is] shown that the *primary* significance of the term in the minds of the consuming public is not the product but the producer." Thus, the crux of the doctrine of secondary meaning "is that the mark comes to identify not only the goods but the source of those goods," even though the relevant consuming public might not know the name of the producer. ... [S]omeone seeking to establish secondary meaning must show that the purchasing public associates goods designated by a particular mark with but a single ... source.
>
> secondary meaning must show that the purchasing public associates goods designated by a particular mark with but a single ... source.
>
> The focus of secondary meaning therefore is the consuming public. Hence, so must be the inquiry into whether the mark owner has a protectible interest. Although the mark owner strives to create a secondary meaning for its product, it is the consuming public which, in effect, determines whether that effort has succeeded.

*Centaur,* 830 F.2d at 1221 (quoting *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10 (2d Cir.1987) (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 133 (S.D.N.Y.1972))) (emphasis in original) (citations omitted). MIPTC makes absolutely no allegations concerning whether secondary meaning for the "Volvo Tennis" mark has been established in the mind of the consuming public.

■ However, assuming that secondary meaning for the "Volvo Tennis" mark has been alleged, a cause of action for unfair competition under the Lanham Act "is made out by showing the use of one's trademark by another in a way that is

likely to confuse consumers as to the source of the product." *Lois Sportswear,* 799 F.2d at 871. The likelihood that an appreciable number of consumers will be confused as to the source of the goods or services at issue is determined by evaluating a number of factors, listed *supra* at page 811. However, other than conclusory allegations that confusion is likely to occur and three specific occasions of actual confusion, MIPTC makes absolutely no allegations regarding those factors. The examples of confusion alleged are irrelevant because they do not involve consumers of the goods and services at issue, but rather are articles published in a magazine and two newspapers. These allegations are insufficient to make out a claim of unfair competition under the Lanham Act.

■ The phrases "linking the world's official tennis tournaments" and "linking the world's great tennis events through television" are similar, but nowhere are they alleged to be marks of any specific product or service. The fact that MIPTC approved the former phrase to introduce television broadcasts of its Grand Prix tennis events does not entitle it to trademark protection. It is not a trademark, and the Lanham Act does not protect it.

Counterclaim 4 alleges that the same facts asserted *supra* in support of counterclaim 3 state a claim that Volvo created a likelihood of confusion by diluting the distinctive quality of the Grand Prix mark in violation of the New York state antidilution statute. Counterclaims and Answer at ¶¶ 130–32; N.Y.Gen.Bus.Law § 368–d (McKinney 1984).[6]

[D]ilution is characterized as a "whittling down" of the identity or reputation of a tradename or mark. ... "Dilution ... 'threatens two separable but related components of advertising value. Junior

uses may blur a mark's product identification or they may tarnish the affirmative associations a mark has come to convey.' "

*Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983) (quoting 3A R. Callman, Unfair Competition, Trademarks, and Monopolies § 21.11 (4th ed. 1983) (quoting Note, *Dilution: Trademark Infringement or Will–O'–The–Wisp?,* 77 Harv. L. Rev. 520, 531 (1964))) (citations omitted). "The interest protected by § 368–d is not simply commercial goodwill, but the selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public." *Sally Gee,* 699 F.2d at 624–25.

In order to state a claim under § 368–d, "a plaintiff must first have a trademark or name which is 'truly of *distinctive* quality' or one which has 'acquired a secondary meaning in the mind of the public,' and must prove a likelihood of dilution." *Miss Universe, Ind. v. Patricelli,* 753 F.2d 235, 238 (2d Cir.1985) (quoting *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 546, 399 N.Y.S.2d 628, 633, 369 N.E.2d 1162, 1166 (1977)) (citation omitted) (emphasis in original).

■ MIPTC does not state such a claim for any of the marks at issue. The phrase "linking the world's official tennis tournaments," as discussed above, is not a trademark and therefore is not protected. Neither distinctiveness, strength, or secondary meaning for the "Nabisco Grand Prix" mark[7] as opposed to "Volvo Grand Prix" mark, nor dilution, weakening, or tarnishing of the value or quality of that mark have been alleged by MIPTC. Moreover, these allegations cannot be deduced from the facts alleged in the counterclaims.

---

**6.** The New York antidilution statute provides that:

[L]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the ab-

sence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 368–d (McKinney 1984).

**7.** It would appear that MIPTC is not claiming any rights to the mark "Grand Prix" since clearly that would be unenforceable.

Therefore, counterclaim 4 fails to state a cause of action under § 368–d.

Counterclaim 5 alleges that the same facts asserted *supra* in support of counterclaim 3 state a claim that Volvo's false and misleading written and broadcast statements regarding Volvo's Grand Prix sponsorship created a likelihood of confusion and misappropriated rights belonging to MIPTC, and therefore constitute common law unfair competition. Counterclaims and Answer at ¶¶ 133–35.

The tort of unfair competition is "generally described as a misappropriation of the skill, expenditures, and labor of another. 'One cannot sell his product by misappropriating the good will of another through misleading the public into thinking that it is "sponsored" by or derived from something else.'" *American Footwear Corp. v. Gen. Footwear Co., Ltd.*, 609 F.2d 655, 662 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980) (quoting *Ideal Toy Corp. v. Kenner Prods. Div. of Gen. Mills Fun Group, Inc.*, 443 F.Supp. 291, 305 (S.D.N.Y.1977)) (citations omitted). An element of bad faith is essential to this tort. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980). In order to make out a cause of action for unfair competition, a complaint must set forth: "(1) the acts or omissions by defendants that proximately caused the misappropriation and (2) the property or benefit misappropriated—mere allegations that [plaintiff has been harmed] will not suffice." *Bunch v. Artec Int'l Corp.*, 559 F.Supp. 961, 972 (S.D.N.Y.1983).

The facts alleged *supra* in support of counterclaim 3 sufficiently set forth the deliberate acts by Volvo that allegedly caused the misappropriation: written and broadcast statements, statements and advertisements in publications, and the naming of Grand Prix events. Those facts also sufficiently set forth the thing allegedly misappropriated, the overall Grand Prix sponsorship, and at least *allege* that MIPTC has been harmed. Therefore, counterclaim 5 may adequately set forth a cause of action under common law unfair competition. As such, however, it can be sustained in this court, absent pendent jurisdiction, only under diversity jurisdiction.

Counterclaim 7 alleges that Volvo breached its overall sponsorship agreement with MIPTC, dated September 25, 1979, by failing to pay amounts owed under that agreement. Counterclaims and Answer at ¶¶ 139–41. Assuming that such an agreement exists, that it is enforceable, and that Volvo has failed to pay amounts owed under it, counterclaim 7 may sufficiently state a cause of action for breach of contract. Again, however, it can be sustained in this court, absent pendent jurisdiction, only under diversity jurisdiction.

Counterclaim 8 alleges that Volvo breached its sanctioning agreement with MIPTC by failing to identify Nabisco prominently, or in some instances at all, as the overall Grand Prix sponsor on promotional and advertising materials connected with a sanctioned event, and by sponsoring a "circuit within a circuit" of Grand Prix events. Counterclaims and Answer at ¶¶ 142–44. Assuming that such an agreement exists, that it is enforceable, that prominent identification of the overall sponsor is required by the agreement, that sponsoring any sort of "circuit within a circuit" is prohibited by the agreement, and that Volvo violated those provisions, counterclaim 8 may sufficiently make out a cause of action for breach of contract.

Counterclaim 9 alleges that the same breaches alleged in counterclaim 8 constitute breach of the overall Grand Prix sponsorship agreement between Volvo and MIPTC. Counterclaims and Answer at ¶¶ 145–47. Making the same assumptions as those required by counterclaim 8, counterclaim 9 may also adequately state a cause of action for breach of contract.

Counterclaim 10 alleges that Volvo breached an agreement with MIPTC that it would provide full financial disclosure concerning the Volvo Masters tournament during those years that Volvo was the overall Grand Prix sponsor and sponsor of the Masters tournaments. Counterclaims and Answer at ¶¶ 148–50. Assuming that such an agreement existed, that it is enforceable, that it required such financial disclo-

sure, and that Volvo has not provided such disclosure, Counterclaim 10 may make out a cause of action for breach of contract.

Counterclaim 11 alleges that Volvo breached its January 1985 agreement with MIPTC to cooperate with MIPTC's reasonable promotional activities. Counterclaims and Answer at ¶¶ 151–53. Assuming that such an agreement exists, that it is enforceable, that it requires such cooperation, that Volvo has failed to so cooperate, and that MIPTC has been damaged thereby, counterclaim 11 may sufficiently state a cause of action for breach of contract.

MIPTC has not made a showing of diversity to support federal diversity jurisdiction over counterclaim 5, for common law unfair competition, and counterclaims 7 through 11 for breach of contract. Furthermore, MIPTC has neither pled that "the matter in controversy exceeds the sum or value of $10,000," as required by 28 U.S.C. § 1332(a) (1982), nor pled any specific amount of damages suffered. Therefore, counterclaims 5 and 7 through 11 are dismissed with leave to replead. While I will permit the parties to replead, I have serious doubts that sufficient damages can be alleged or proven by this collection of counterclaiming defendants. Any damages suffered under most of the counterclaims would have been incurred solely by Nabisco. It appears, however, that counterclaims 7 and 10 for money damages and for an accounting against Volvo, ProServ, Dell, and Benton may include the requisite damage to these counterclaiming defendants. However, I cannot rule on these matters until such time as the counterclaiming defendants have had the opportunity to replead.

Counterclaim 13 alleges that Volvo has made false statements to the press which have defamed Happer, have disparaged him in his profession, and have exposed him to public ridicule and contempt within the tennis and legal communities. Counterclaims and Answer at ¶¶ 157–64.

In order to state a cause of action for defamation, a plaintiff must plead that defendant "(1) negligently or wilfully uttered a (2) defamatory statement (3) of or concerning the plaintiff (4) to a third person (5) which resulted in damage to plaintiff's reputation." *Carto v. Buckley*, 649 F.Supp. 502, 505 n. 1 (S.D.N.Y.1986). In defamation actions, "the false and defamatory matter should be pleaded in *haec verba*." *Foltz v. Moore McCormack Lines, Inc.*, 189 F.2d 537, 539 (2d Cir.), *cert. denied*, 342 U.S. 871, 72 S.Ct. 106, 96 L.Ed. 655 (1951); *Herbert v. Lando*, 603 F.Supp. 983, 990 (S.D.N.Y.1985), *aff'd in relevant part, rev'd in part*, 781 F.2d 298 (2d Cir.1986). The Court in *Foltz* held that paraphrasing the allegedly defamatory statements would be insufficient to state a cause of action for defamation. *Foltz*, 189 F.2d at 539.

Nowhere in MIPTC's papers are the allegedly defamatory statements set forth. Like the plaintiff in *Foltz*, MIPTC paraphrased the allegedly false statements in its pleadings. Counterclaims and Answer at ¶¶ 109, 117(38), 158–61. This counterclaim is insufficient on its face.

Counterclaim 14 alleges that Volvo has defamed MIPTC by making false statements to the press and others accusing it of greed, dishonesty, bad faith, and fraud. *Id.* at ¶¶ 165–74. Again, the allegedly defamatory statements are not set forth in any of MIPTC's papers. MIPTC paraphrased the allegedly false statements in its pleadings. *Id.* at ¶¶ 82, 83, 86, 89, 109, 166–71. Again, this counterclaim is insufficient to make out a cause of action for defamation.

Volvo's motion to dismiss the counterclaims against it is granted in part and denied in part. Counterclaims 1 through 4, 13, and 14 against it are dismissed. Counterclaims 5 and 7 through 11 against it are dismissed with leave to replead granted. Because MIPTC nowhere asserts a cause of action for fraud against Volvo, Volvo's motion to strike the references to fraud made in paragraphs 81 through 83, 86, 88, 89, and 102 of the Counterclaims and Answer is hereby granted. Because counterclaims 1 and 2 are dismissed for failure to state a cause of action, Volvo's motion to dismiss counterclaims 1 and 2 for lack of subject matter jurisdiction is denied as moot.

### 2. *ProServ, Dell, and Benton's Motion to Dismiss the Counterclaims*

ProServ, Dell, and Benton move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all the counterclaims alleged by MIPTC and Happer against them for failure to state a claim upon which relief can be granted. ProServ, Dell, and Benton also move, pursuant to Fed.R.Civ.P. 12(f), to strike the newspaper and magazine quotations recited in paragraph 57 of the Counterclaims and Answer as immaterial, impertinent, scandalous, and impossible to properly respond to.

Counterclaim 1 alleges that ProServ, including Dell and Benton as its agents, combined and conspired with Volvo to dominate and control men's professional tennis in violation of Section 1 of the Sherman Act. Counterclaims and Answer at ¶¶ 118–22; 15 U.S.C. § 1. As discussed *supra,* at pages 804 through 808, and for the reasons stated there, these allegations are insufficient to state a Section 1 violation.

■■■ Counterclaim 1 also accuses ProServ and IMG of unlawfully and improperly using their market power over the world's top-ranked tennis players in order to "dominate, control or exert significant influence over a majority of" all men's professional tennis events worldwide, in violation of Section 1. Counterclaims and Answer at ¶ 30. In support of this claim, MIPTC alleges that ProServ and IMG perform one or more of the key functions involved in producing a majority of the major Grand Prix events (owner, manager, merchandising agent, sponsorship agent, television agent, player representative) and that by doing so, ProServ and IMG exercise inordinate power over those events. *Id.* at ¶¶ 31–35. MIPTC also alleges that for the special events which ProServ and IMG own or control outright, they exercise absolute power over the event, including the ability to exclude players whom they do not represent. *Id.* at ¶ 36. While MIPTC asserts that ProServ and IMG exercise power over men's tennis events, it nowhere asserts that ProServ and IMG combined or conspired to do so. Similarly, no allegation is made that, or how, this power (assuming it exists as alleged in the counterclaims) unreasonably restrains trade. Finally, MIPTC does not allege how it may have been harmed or what, if any, damages may have been sustained by it due to this power. Because none of the three required elements of a cause of action under Section 1 are alleged, this counterclaim must be dismissed.

MIPTC accuses ProServ and IMG of leveraging their control over players into control over tournaments, and ultimately into restraint of trade in the players, events, and television markets. *Id.* at ¶¶ 42–43. In support of this claim, MIPTC alleges that "ProServ and IMG exert extensive power over [professional tennis] players from 'the cradle to the grave.'" *Id.* at ¶ 44. Specifically, ProServ and IMG (1) offer financial guarantees and wild card spots in order to induce promising young players to sign agency contracts with them, and coerce young players by threatening that they will not get any wild card spots if they do not sign agency contracts with them, *id.* at ¶¶ 45, 117(1)–(3); (2) extend loans and financial benefits to tennis coaches to enlist their support in signing young players to agency contracts, without disclosing such arrangements, *id.* at ¶¶ 45, 117(4); (3) own the only existing circuits of events exclusively for players aged 35 to 45 and over 45 years of age, *id.* at ¶¶ 47–48, 117(7); (4) pressure and pay under-the-table guarantees to their players to have them participate in tournaments in which ProServ and IMG have a financial interest, *id.,* at ¶¶ 5, 6; (5) coerce tournament organizers to give them a role or a financial interest in tournaments by threatening that without such an agreement, their players will not appear in the tournaments, or by threatening to run a special event at the same time as their tournaments, *id.* at ¶¶ 50, 117(8)–(9); (6) combine to recognize and promote each of their spheres of influence by refraining from running events opposite one another and exchanging their players' services for one another's events, *id.* at ¶¶ 50, 117(11); (7) control the schedules at their events to favor their players, and control the advertising of their events to favor their players, to the detriment of higher-

ranked players whom they do not represent, *id.* at ¶ 117(14)–(15); and (8) have leveraged their control of players into control over the television broadcast rights to a majority of Grand Prix events by threatening tournament owners that their players would not play in a specific tournament unless ProServ or IMG was granted the television broadcast rights to the tournament, *id.* at ¶ 54. Although these assertions indicate that ProServ and IMG exercise power over professional men's tennis players, and therefore exert some influence on men's professional tennis events, it is nowhere asserted that ProServ and IMG combined or conspired to do so. The only allegation of combined action between ProServ and IMG is that they cooperate with each other in scheduling certain events and in making some tennis players available to play in the other's events. Even assuming that this assertion sufficiently alleges a combination or conspiracy between ProServ and IMG, no allegation is made that or how this conspiracy unreasonably restrains trade, or how MIPTC may have been harmed and what damages it has sustained because of it. Again, these allegations are insufficient to make out a cause of action under Section 1.

Counterclaim 2 alleges that ProServ, including Dell and Benton as its agents, combined and conspired with Volvo to monopolize the players, events, and television markets in violation of Section 2 of the Sherman Act. Counterclaims and Answer at ¶¶ 123–26; 15 U.S.C. § 2. As discussed *supra,* at pages 808 through 809, and for the reasons stated there, these allegations are insufficient to state a Section 2 violation.

Counterclaim 2 also alleges that the same scheme between ProServ and IMG to dominate and control men's tennis discussed above constitutes a combination and conspiracy to monopolize the players, events, and television markets in violation of Section 2. However, nowhere in the counterclaims does MIPTC allege that ProServ and IMG possess monopoly power over the players, events, or television markets; neither can that allegation be inferred from the facts alleged in the counterclaims. While the facts in the counterclaims may allege that ProServ and IMG exert some influence on these markets, they do not possess the power to control prices or exclude competition: a new player representation firm was formed during the period when Volvo and ProServ were actively pursuing renewal of, and MIPTC was soliciting bids for, the overall Grand Prix sponsorship. Counterclaims and Answer at ¶ 76. Moreover, even assuming that ProServ and IMG possess monopoly power in the relevant markets, MIPTC nowhere distinguishes their acquisition of that power from the fact that, as alleged in the counterclaims, ProServ and IMG established their positions in the players, events, and television markets largely as consequences of the recent historical development of the sport of men's professional tennis. The allegations in the counterclaims are therefore insufficient to state a Section 2 violation.

Counterclaim 3 alleges that the same facts alleged against Volvo also state a cause of action against ProServ, Dell, and Benton under the Lanham Act. Counterclaims and Answer at ¶¶ 127–29; 15 U.S.C. § 1125(a) (1982). For the same reasons as those discussed *supra* at pages 809–12, the allegations asserted by MIPTC are insufficient to state a cause of action against ProServ, Dell, and Benton for unfair competition under the Lanham Act.

Counterclaim 4 alleges that the same facts alleged against Volvo also state a cause of action against ProServ, Dell, and Benton under the New York antidilution statute. Counterclaims and Answer at ¶¶ 130–32; N.Y.Gen.Bus.Law § 368–d. For the same reasons as those discussed *supra* at page 812, the allegations asserted by MIPTC are insufficient to state a cause of action against ProServ, Dell, and Benton under § 368–d.

Counterclaim 5 alleges that the same facts asserted against Volvo also state a cause of action against ProServ, Dell, and Benton for common law unfair competition. Counterclaims and Answer at ¶¶ 133–35. For the same reasons as those discussed

*supra* at pages 812–13, the allegations asserted by MIPTC may adequately set forth a cause of action against ProServ, Dell, and Benton under common law unfair competition. Absent pendent jurisdiction, however, it may be sustained in this court only under diversity jurisdiction.

Counterclaim 6 alleges that ProServ, Dell, and Benton participate in the affairs of men's professional tennis through a pattern of racketeering activity, in violation of 18 U.S.C. § 1964(c) (1982) ("RICO"),[8] including acts of mail fraud, in violation of 18 U.S.C. § 1341 (1982), and wire fraud and television fraud, in violation of 18 U.S.C. § 1343 (1982). Counterclaims and Answer at ¶¶ 136–38.

In order to state a cause of action under Section 1964(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. ... In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex, Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985) (footnote omitted). A pattern of racketeering activity consists of at least two specified criminal acts which have sufficient continuity and relationship to constitute a pattern. *See Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14; 18 U.S.C. § 1961(1), (5) (1982 & Supp. IV 1986).

In the case at bar, assuming that MIPTC has made out all the requisite elements of a civil RICO cause of action, the predicate racketeering acts alleged consist of "mail fraud (in violation of 18 U.S.C. § 1341) and wire and television fraud (in violation of 18 U.S.C. § 1343), some of which have been described above in paragraphs 1–117." Counterclaims and Answer at ¶ 137. Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Nowhere in the pleadings does MIPTC particularize the averments of fraud against ProServ, Dell, and Benton. Moreover, according to the language of the sixth counterclaim, only some of the averments of fraud have been described in the allegations supporting the counterclaims. This is insufficient to state a civil RICO cause of action.

Counterclaim 10 alleges that ProServ, Dell, and Benton breached an agreement with MIPTC that they would provide full financial disclosure concerning the Volvo Masters tournament during those years that Volvo was the overall Grand Prix sponsor and sponsor of the Masters tournaments. Counterclaims and Answer at ¶¶ 148–50. Assuming that such an agreement existed, that it is enforceable, that it required such financial disclosure, and that ProServ, Dell, and Benton have not provided such disclosure, counterclaim 10 may make out a cause of action for breach of contract. Again, absent pendent jurisdic-

---

**8.** The civil RICO statute provides, in pertinent part, that:

[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c) (1982).

Section 1962 provides as follows:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activi-

ties of which affect, interstate or foreign commerce.

(b) It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity....

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

18 U.S.C. § 1962 (1982).

tion, it may be sustained in this court only under diversity jurisdiction.

Counterclaim 11 alleges that ProServ breached its January 1985 agreement with MIPTC to cooperate with MIPTC's reasonable promotional activities. Counterclaims and Answer at ¶¶ 151–53. Assuming that such an agreement exists, that it is enforceable, that it requires such cooperation, and that ProServ has failed to so cooperate, counterclaim 11 may sufficiently state a cause of action for breach of contract.

Counterclaim 12 alleges that ProServ breached its sanctioning agreement with MIPTC by failing to identify Nabisco prominently, or in some instances at all, as the overall Grand Prix sponsor on promotional and advertising materials connected with the sanctioned event, and by sponsoring a "circuit within a circuit" of Grand Prix events. Counterclaims and Answer at ¶¶ 154–56. Assuming that such an agreement exists, that it is enforceable, that prominent identification of the overall sponsor is required by the agreement, that sponsoring any sort of "circuit within a circuit" is prohibited by the agreement, and that ProServ violated those provisions, counterclaim 12 may sufficiently make out a cause of action for breach of contract.

MIPTC has not made a showing of diversity to support federal diversity jurisdiction over counterclaim 5, for common law unfair competition, and counterclaims 10 through 12 for breach of contract. Furthermore, MIPTC has neither pled that "the matter in controversy exceeds the sum or value of $10,000," as required by 28 U.S.C. § 1332(a) (1982), nor pled any specific amount of damages suffered. Therefore, counterclaims 5 and 10 through 12 are dismissed with leave to replead. As I stated previously, I will permit the parties to replead despite serious doubts that sufficient damages can be alleged or proven by this collection of counterclaiming defendants against the other parties to this lawsuit.

Counterclaim 13 alleges that the same facts as those alleged against Volvo state a cause of action against ProServ, Dell, and Benton for defamation of Happer. Coun-

terclaims and Answer at ¶¶ 157–64. For the reasons discussed *supra* at page 814, those allegations are also insufficient to make out a cause of action for defamation against ProServ, Dell, and Benton.

Counterclaim 14 alleges that the same facts as those alleged against Volvo state a cause of action against ProServ, Dell, and Benton for defamation of MIPTC. Counterclaims and Answer at ¶¶ 165–74. For the reasons discussed *supra* at page 814, those allegations are also insufficient to make out a case of defamation against ProServ, Dell, and Benton.

ProServ, Dell, and Benton's motion to dismiss the counterclaims against them is granted in part and denied in part. Counterclaims 1 through 4, 6, 13, and 14 against them are dismissed. Counterclaims 5 and 10 through 12 are dismissed with leave to replead granted. The motion, pursuant to Fed.R.Civ.P. 12(f), to strike all of the press quotations from the Counterclaims and Answer is denied.

### 3. *IMG and McCormack's Motion to Dismiss the Counterclaims*

IMG and McCormack move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all of the counterclaims alleged by MIPTC and Happer against them for failure to state a claim upon which relief can be granted.

Counterclaim 1 alleges that IMG, including McCormack as its agent, combined and conspired with ProServ to dominate and control men's professional tennis in violation of Section 1 of the Sherman Act. Counterclaims and Answer at ¶¶ 118–22; 15 U.S.C. § 1. As discussed *supra*, at pages 814–16, and for the reasons stated there, these allegations are insufficient to state a Section 1 violation.

Counterclaim 2 alleges that IMG, including McCormack as its agent, combined and conspired with ProServ to monopolize the players, events, and television markets in violation of Section 2 of the Sherman Act. Counterclaims and Answer at ¶¶ 123–26; 15 U.S.C. § 2. As discussed *supra*, at page 816, and for the reasons stated there,

these allegations are insufficient to state a Section 2 violation.

Counterclaim 13 alleges that the same facts as those alleged against Volvo also state a cause of action against McCormack for defamation of Happer. Counterclaims and Answer at ¶¶ 157–64. For the reasons discussed *supra* at page 814, these allegations are insufficient to make out a case of defamation against McCormack.

Accordingly, IMG and McCormack's motion to dismiss counterclaims 1, 2, and 13 against them is granted.

CONCLUSION

In sum, counterclaims 1 through 4, 6, 13, and 14 are dismissed. Counterclaims 5 and 7 through 12 are dismissed with leave to replead granted.

SO ORDERED.